*C. L. Kennan* and *S. M. Young,* for plaintiff.

*C. P. & L. W. Wickham,* for defendants.

---

## WILLS.

[Circuit Court of Lucas County.]

BERTHA KETTEMANN, EXECUTRIX, ETC., ET AL v. KATIE METZGER.

Decided, November 1, 1901.

*Will—Questions in Suit to Set Aside—Undue Influence and Mental Unsoundness—Evidence Based Upon Facts in Decedent's Life at Time of Making of the Will—Competent, Though It May Be of Little Weight—Charge of the Court—Where the Will is Unjust, Jury may Consider Reasons Therefor—Reviewing Court may Weigh the Evidence—And Set Aside a Jury's Finding Where Manifestly Wrong— A Fair and Natural Disposition of Property.*

1. In a suit to contest a will involving a claim of undue influence, any testimony that will shed light on the question of whether the will as made was the will of the testator is competent.

2. And so as to mental unsoundness. Non-expert witnesses who were acquainted with the testator may be called, and their testimony received for what it may be worth.

3. The affidavit of a witness to the execution of a will, made in connection with the admission of the will to probate, is not competent in a suit to break the will, where it does not appear that the witness is prevented by death or otherwise from being present to testify.

4. For the court to charge the jury that "it is the right of every man, which right can not be taken from him, to do what he desires with his own, unless the disposition he makes violates some law," is misleading for the reason that it leaves undue influence or mental capacity entirely out of the question.

5. Where an unjust will has been made, it is the province of the jury to consider whether the testator would have made such a will, had he been of sound mind or free from undue influence.

6. A reviewing court has power to review the testimony in a will case, and if the verdict is clearly and manifestly against the weight of the evidence, it has the power to set aside the verdict and order a new trial as in other cases.

7. Where the weight of the testimony clearly indicates that the testator had sufficient mental capacity to make a will, and in view of all the circumstances the will which he did make was a fair and natural one, a finding by a jury that such will was not the decedent's last will and testament should be set aside.

HULL, J.; HAYNES, J., and PARKER, J., concur.

Heard on error.

This action is brought to set aside the will of John Kettemann. It was heard in the court of common pleas before the court and daughter of John Kettemann deceased, was the plaintiff below; setting aside the will. Katie Metzger, defendant in error, the daughter of John Kettemann, deceased, was the plaintiff below; plaintiffs in error were the defendants. It is to set aside the judgment entered upon the verdict that these proceedings in error are brought in this court.

Plaintiffs in error claim that the court below erred in admitting evidence and in ruling out certain testimony; erred in its charge to the jury and in its refusal to give certain requests asked; and further, that the verdict of the jury was against the weight of the evidence and not sustained by sufficient evidence, and that the court erred in overruling the motion for a new trial on that ground.

A large number of witnesses were called upon the trial—altogether about thirty—the plaintiff below calling twelve and the defendants nineteen. The petition asked to have the will set aside on the ground that John Kettemann was mentally incapacitated to make a will at the time it was made, and upon the further ground that the will was brought about by the undue

influence of Bertha Kettemann, his wife, and certain other persons not named in the petition. John Kettemann at the time of his death, which occurred in August, 1900, was sixty-seven years old. The will was made on March 4, 1880, when he was forty-seven years of age, and gave all of his property to Bertha Kettemann, who was then his wife by a second marriage, which occurred October 23, 1879, a few months before the making of the will. Katie Metzger, the plaintiff below, was John Kettemann's only daughter by his first marriage, and only surviving child at the time the will was made. John Kettemann and George Kettemann, two of the plaintiffs in error, are the sons of Bertha Kettemann by her marriage with John Kettemann. John Kettemann left an estate, according to the testimony, amounting to between $15,000 and $16,000 in real estate and personal property, the real estate being valued at between $13,000 and $14,000, he having $2,000 in a bank at the time of his death. Katie Metzger's mother, the wife by the first marriage, had some property, and as that cuts some figure in the case, I will mention it. She died leaving an estate of perhaps $5,000 or $6,000, most of which in the end, as will appear in the discussion of the case, went to Katie Metzger, the only daughter.

After John Kettemann's death the will in question was found in his safe. The evidence does not disclose who wrote the will. They were unable, apparently, to find out in whose handwriting it was. He referred to it in the last days of his life, or rather referred to his papers, stating to those around him that his papers would be found in his safe; and among them was found this will. The record does not disclose that his widow or either of his two sons had any knowledge of the existence of this will until after his death.

The will is very short, and was drawn substantially after the form given in Swan's Treatise, where a testator gives all of his property to his wife. On the face of it, it was duly executed and witnessed by two witnesses. It covers altogether about a page of "legal cap." It was duly admitted to probate by the probate court of this county, and not long thereafter the peti-

tion was filed by Katie Metzger, his daughter, to set aside the will.

The testimony in the trial of the case took a wide range, as is usual in will cases, covering the last twenty-five or thirty years of John Kettemann's life; and his relations with his daughter and his first wife, his second wife, his relations with his neighbors; his conduct; his peculiarities and his characteristics; his habits; his expressions of affection or want of affection for his daughter and first wife, and many other matters were gone into in the testimony, to bring before the jury as nearly as possible a sort of word photograph of the testator in all of his relations in life, particularly his relations with those who might be the proper objects of his bounty; and testimony as to his mental capacity, his peculiarities, eccentricities, his habits of drinking, so far as that affected his mental capacity, was given by witnesses called on both sides.

After hearing all the testimony and the charge of the court, the jury returned a verdict that the paper in question was not John Kettemann's will. A motion for a new trial was overruled, and by the judgment of the court the will was set aside.

Plaintiff in error claims that at the trial of the case the court erred in admitting certain evidence offered by the plaintiff. The first of this evidence to which I will refer was testimony relating to the habits of his first wife for frugality and industry and his relations with her, showing that he and she lived happily together, that he had affection for her; testimony as to the habits of Katie Metzger, the plaintiff below, of frugality; the work that she did after her mother died, which was in 1873, and before her father's marriage with the plaintiff, which was in 1879. There was considerable testimony of that kind introduced over the objection of the defendants below, and to which they excepted, and the admission of it is claimed as one of the errors in the trial.

Before discussing that I may as well speak of another class of evidence that was allowed to be introduced, and that was testimony as to what John Kettemann said about his wealth before he made this will—the amount of property that he was worth; some of the witnesses testifying that he said he was worth $60,-

'000 to $70,000, and some of them said $75,000; testimony as to conversations between him and Katie, and his demeanor toward her and his conduct toward her. He finally came to dislike her for some reason, and indicated it by harsh language toward her about the time she left her father's house. This was objected to, and exception taken. In a general way this was the character of this class of evidence to which objection was made.

It is urged that the fact that John Kettemann's first wife was frugal or industrious, or the fact that Katie worked in her father's house for some years after her mother's death, did not prevent his making a will which disinherited Katie, the daughter of his first wife. As a proposition of law, that is, of course, correct, but where the question is whether a will has been produced by undue influence, in connection with the question whether the testator had sufficient mental capacity to make a will, any testimony that might or would shed any light upon the question as to whether the will as made was probably his will or not, or whether brought about by any undue influence, is competent. The weight of the testimony is properly left to the jury, considering all the testimony in the end that has been offered, and determining the question whether the paper writing is in fact the will of the testator or not. If the testimony was entitled to any weight in the consideration of this question, it was properly admitted. In our judgment this testimony was properly admitted by the court. The plaintiff was entitled to show all these things in connection with all the other testimony that she had, bearing upon the question of John Kettemann's capacity, and of undue influence, and have it all go to the jury, and there was no error in admitting this testimony.

Several non-expert witnesses were called by the plaintiff below, and over objection were permitted to testify that in their judgment John Kettemann was of unsound mind. This testimony was objected to, and its admission is claimed to be error, on the ground that non-expert witnesses should not be permitted to give their opinion as to a man's mental capacity, unless based upon facts showing that they are competent to give an opinion that would be entitled to some weight.

The rule is laid down in Ohio in *Clark* v. *State,* 12 Ohio, 483, where the Supreme Court say in the syllabus: "On the question of insanity, witnesses, other than professional men, may state their opinion, in connection with the facts on which it is founded." This is perhaps the leading case in Ohio on the question, which is fully discussed in the opinion. The case has always been followed.

The testimony of these witnesses discloses that they did in each case state some facts on which they based their opinion. In some cases there were more facts than others. In the case of some witnesses the facts which they stated were quite meager, but yet in each case the witness showed some acquaintance, and in most of the cases quite a long acquaintance with John Kettemann, and testified to some peculiarity or eccentricity on which they based their opinion that he was of unsound mind, and we think that there was no error in admitting the testimony of these witnesses. Where their testimony disclosed that they had but little opportunity to observe him, and were not able to state facts that shed very much light upon his mental condition, the opinion would not be entitled to a great deal of weight with the jury. But it was a question of weight rather than competency, each witness testifying to some facts and to an acquaintance with Kettemann which, in our judgment, under the rule, entitled the plaintiff to have his opinion as a non-expert witness. I will say in passing that there were no "experts" called in this case on either side to testify on the question of mental capacity.

It is claimed that the court erred in ruling out the affidavit of one of the witnesses to the will; that is, the affidavit, or rather what is called the testimony of the witness to the will which was filed in writing in the probate court in the form of an affidavit, the statute providing for the admission of the will and its probate on the part of the defendants in opening the trial of a will contest. In this case, not only the order of probate was read, but the written testimony of one of the witnesses, Valentine Braun, as it appeared in his affidavit filed in the probate court, which was short, and in the usual form, in which he makes oath that he subscribed his name as a witness "at the request of the testator, and in his presence, and in the presence of Franz Holze-

mer, and that he saw said testator sign said instrument at the end thereof and heard him acknowledge the same to be his will, and that said John Kettemann, at the time of executing the same, was of full age, and of sound mind and memory, and not under any restraint.''

A printed form was used for this affidavit.    It was said in argument that the affidavit was read during the absence of counsel for the plaintiff at the trial of the case, though that does not appear in the record.

Section 5862, Revised Statutes, provides:

''On the trial of such issue, the order of probate shall be *prima facie* evidence of the due attestation, execution, and validity of the will or codicil.''

. Section 5863 and 5864, Revised Statutes, provide as follows:

''Section 5863.    A certified copy of the testimony of such of the witnesses examined upon the probate as are out of the jurisdiction of the court, dead, or have become incompetent since the probate, shall be admitted in evidence on the trial.

''Section 5864.    The party sustaining the will shall be entitled to open and close the evidence and argument; he shall offer the will and probate, and rest; the opposite party shall then offer his evidence; the party sustaining the will shall then offer his other evidence; and rebutting testimony may be offered as in other cases.''

Section 5864, Revised Statutes, provides that the party sustaining the will shall offer the will and probate, and rest, and, as we understand that statute, that means the order of probate, the judgment and decree admitting the will to probate, and does not cover the affidavit of witnesses filed; but Section 5863, Revised Statutes, seems to provide for the admission of the affidavits in case of the death or absence or incompetence of the witnesses. It says a ''copy of the testimony of such of the witnesses examined upon the probate as are out of the jurisdiction of the court, dead, or have become incompetent since the probate, shall be admitted in evidence on the trial.''

In this trial there was no evidence that either one of these witnesses was dead or incompetent or absent, and we are of the opinion that the affidavits were not proper evidence upon the trial, and there was no error in excluding the one read.    There

would seem to be no reason why such a piece of testimony as this should be admitted upon the contest of a will in a trial before a jury. If the witnesses were living and competent, they should have been brought into court and subjected to cross-examination like other witnesses. It is to be presumed that the probate court acted upon sufficient evidence when the will was admitted to probate, and the judgment of that court admitting it to probate and the will itself are competent evidence; and that makes a case for the defendants until it has been overcome by the plaintiff.

It is claimed that the court erred in refusing to charge as requested by the defendants below. Several requests were made. Some were given, but most of them refused. I will speak only of one, request No. 7, which was refused, and which is especially relied upon as error:

"It is the right of every man, which right can not be taken from him, to do what he desires with his own, unless the disposition he makes violates some law; and after his death, neither court nor jury have the power to make for him a disposition of his property different from the disposition which he intended to make, upon any theory that such intended disposition was unjust and wrong."

This request was perhaps taken from the charge of a court as reported in one of the law bulletins, or substantially so. With some qualification it would state the law correctly, but in our judgment, given in this form, it would be misleading to the jury, and is not a correct statement of the law. It begins: "It is the right of every man, which right can not be taken from him, to do what he desires with his own, unless the disposition he makes violates some law." That leaves out entirely the question of the mental capacity or incapacity of the testator, and the question of undue influence. It is only a person of sound mind and memory—of testamentary capacity—who is under no restraint, who can make a will, as the statute, Section 5914, Revised Statutes, in substance provides. And to say to the jury that "it is the right of every man, which can not be taken from him, to do what he desires with his own, unless the disposition he makes violates some law," where the two chief questions in the case were whether the testator was of unsound mind or not, and whether

he was acting under undue influence at the time he made his will, would be misleading, because it leaves out entirely the question of undue influence and mental capacity. The will of John Kettemann was to be sustained if he had sufficient mental capacity to make a will when he signed it, and if he was not under undue influence of such a character as would make the will not his will, but the will of some other person.

The request, after what I read, proceeds, "And after his death, neither court nor jury have the power to make for him a disposition of his properly different from the disposition which he intended to make, upon any theory that such intended disposition was unjust and wrong." That part of the request is probably a correct statement of an abstract proposition of law. The whole request is really an abstract proposition of law, and is not made to apply directly to the case on trial. But while the latter part is abstractly correct, still the jury would have the right to consider in a will contest, along with all other facts and circumstances, whether the will was unjust or wrong, in determining whether or not it was in fact the will of the testator. While a man has a right to make an unjust will, or one which in the common judgment of mankind is called wrong, still, in determining the question whether the paper writing is in fact the will of the man, the jury have the right to consider whether he would, if he was sound mentally, make such a will. On the whole, we think there was no error in refusing this request; and we find no error in the refusal to give the other requests which were refused.

The principal question in the case is whether the verdict of the jury was sustained by sufficient evidence. It is contended by the plaintiffs in error that the verdict was manifestly and clearly against the weight of the evidence, and for that reason that the judgment should be set aside. It is urged by defendant in error that the question of mental capacity and undue influence in a will contest is one peculiarly for a jury, and that where there is any testimony, or any considerable amount of testimony, tending to sustain either of these propositions, a reviewing court should not set aside the judgment of the court below affirming the verdict on the ground that the verdict is against the prepon-

derance of the evidence only. The statute (Section 5861, Revised Statutes) itself is quoted, which provides that the question of the validity of the will must be submitted to a jury, and that the verdict shall be conclusive, unless a new trial be granted or the judgment be reversed or vacated. While it is true that the issue in a will contest can only be tried by a jury, in our judgment this means trial by a common law jury, as all cases that are tried to juries are tried. The court presides, and passes upon the questions of law. He instructs the jury as to the law, and the trial is conducted in all respects as any other trial. And the Supreme Court has held in *Wagner* v. *Ziegler,* 44 Ohio St., 59, that where there is no evidence offered by the plaintiff to overcome the testimony in favor of the will—no evidence tending to show that the paper was not the will of the testator—the judge may so instruct the jury and direct a verdict. The second paragraph of the syllabus is as follows:

"In the trial of the contest of a will, where the testimony introduced does not tend to prove the issue on the part of the plaintiffs showing incapacity of the decedent to make a will at the time the will was made, it is not error for the court, at the conclusion of the plaintiff's testimony, to direct the jury to find a verdict sustaining the will."

The question of the respective duties of the jury and the court in a will contest are quite fully discussed in the opinion.

It is true that in will contests these questions of mental incapacity and undue influence are peculiarly questions for the jury, as many other questions are; as, for instance, questions of negligence; they are peculiarly addressed to the jury, and a jury is better able, probably, coming from all the walks of life, and familiar with the motives that actuate men in general and their conduct, to pass upon such questions than any other tribunal which could be constructed. But the statute simply provides that the verdict of the jury shall be conclusive unless a new trial is ordered or the judgment be reversed or vacated. So that we hold that a reviewing court has the power to review the testimony in a will case, and if the verdict is clearly and manifestly against the weight of the evidence, it has the power to set aside the verdict and order a new trial, as in other cases.

It is not possible, within the limits of this opinion, to review even briefly the testimony of each witness that was called in the trial below upon the question of mental capacity or undue influence.

John Kettemann, at the time he made his will, was forty-seven years of age.  He had lived in New York and came to Toledo about the beginning of the civil war, and had lived in Toledo at the time he made the will, about twenty years.  He had accumulated property worth about $20,000.  He was a merchant tailor, and a dealer in ready made clothing, and for a long time had a place of business on Summit street, near the Steadman monument.  About the time the will was made he moved into Broadway.  Prior to that time he had had his place of business in different parts of the city.  He did quite an extensive business, and accumulated this property all by his own industry and frugality and shrewdness in business.  At the time he made the will he had several houses and lots.  At the time of his death in 1900 he had some thirteen houses and lots which he rented, collecting the rents from the tenants.  It is claimed that his mind had become affected by the excessive use of intoxicating liquor, and further, that he was afflicted with epileptic fits, which affected his mind, and that his mind was so affected at the time this will was made that he was incapacitated from making a will.

Some of the witnesses called by the plaintiff testified that in their judgment he was mentally unsound about the time this will was made.  Katie Metzger, the plaintiff, her husband, Conrad Metzger, and his brother, testified to that effect; and perhaps three others, including one of the name of Sass.  These, when called, testified, after stating certain things upon which they based their opinion, that in their judgment he was unsound.  According to their testimony he was at times in the habit of drinking or at times drank excessively, and became intoxicated; that he was a man of excitable temperament, and sometimes became very angry and used profane language, and swore at people generally, and sometimes called his customers thieves and robbers and rogues, especially when they attempted to beat him down in the price that he asked for his clothing; and sometimes, not very many times, but a few times, had fallen in one of these fits, as

they were called.   No witness testified that it was epilepsy that
affected him, but the testimony shows rather that it was a heart
trouble.   On the other hand, some of the witnesses called by the
plaintiff below testified that in their judgment Kettemann was of
sound mind at and about the time the will was made.

One witness, Henry Schweibald, testifies on page 14 of the rec-
ord, that he could not say that he was of unsound mind.   Philip
Hassenzahl, who was at one time county commissioner of this
county, was called by the plaintiff.   He testified that he had
known Kettemann for thirty years, and dealt with him to a con-
siderable extent; was often in his place of business; and that
in his judgment he was sound.   John N. Hauser, who had known
him for many years, testifies that in his judgment he was sound.
On page 42 of the record another witness testifies that he was
"all right" so far as drinking was concerned, and did not drink
to excess, so far as she knew.   Another witness called by the
plaintiff, Louis Wacker, testified that he never saw him drunk.
Mr. Court Brown was also called by the contestant.   He testified
that he sold the deceased, in the later years of his life, bonds
on different occasions; that he had bought them for himself and
for others.   On page 53 of the record he testifies, on cross-ex-
amination, as follows:

"Q.   What kind of a business man was Mr. Kettemann at that
time?
"A.   Pretty shrewd, I should think.
"Q.   Did he understand how to buy bonds?
"A.   I think he did.
"Q.   During all the time that you knew him he was a good,
shrewd, practical business man?
"A.   Why, yes; I considered him a very good business man."

I call attention to this witness as one called by the contestant
when putting in her case.   There were six of those called by the
contestant, the substance of whose testimony was that Mr. Kette-
mann was of sound mind, and in fact, that he was attending to
his business in the ordinary way during all those years.

The defendants below called altogether nineteen witnesses.
There were some sixteen or seventeen of these who testified as
to Kettemann's mental condition and capacity, and testified that

in their judgment it was sound, many of them having known him for a great many years. One of them knew him in New York when he was a poor journeyman tailor, working there by the day, before the war. He knew him when he came to Toledo about 1860, and knew him and associated with him all the time up to his death. So we have altogether about twenty-two or twenty-three witnesses whose testimony is that during all these years, so far as they knew him, including about the time he made this will—1880—and after he made the will, John Kettemann was of sound mind. On the other hand, we have the testimony of Katie Metzger, her husband and his brother, and three other witnesses who were called, making six in all, that in their judgment he was of unsound mind. So that, so far the witnesses considered numerically are concerned, those who testified that in their judgment John Kettemann was of sound mind by more than three times outnumbered those who testified that he was of unsound mind.

But these questions are not to be determined entirely by the number of witnesses. The jury had an opportunity to see them; but still it is a proper thing for consideration by the court, and it should be given great weight, that of all these people who were called, who had an opportunity to see him, and who talked with him, dealt with him, ate with him, and drank with him, twenty-three of them gave their judgment to the jury that he was of sound mind, and only six, three of whom may be called interested witnesses, testified that he was unsound. We should, however, consider in connection with this testimony incidents in John Kettemann's life and the lives of those who attack his will.

The plaintiff, Katie Metzger, lived with him after her mother's death in 1873, and in June, 1878, she was married, and she lived with her father at his request, according to the testimony, after her marriage to Conrad Metzger. Kettemann was acquainted with Bertha, his second wife, for some time before he married her, and, according to the testimony, received letters from her, and the courtship was going on apparently about a year. Before he married her, which was October 23, 1879, he ordered Katie Metzger, his daughter, and her husband,

out of his house for some reason.  He had conceived a dislike
to Katie's husband, and did not care to have them live there
any longer, and, according to the testimony, he had conceived
a dislike, and a very great dislike, for some reason, to Katie
Metzger, his daughter.  The cause of this does not very clearly
appear from the record.  It does appear that Katie's marriage
with Conrad was a hasty one, and, for some reason, Kettemann
disliked Metzger.  A child was born in Kettemann's house
before they left.  According to Conrad Metzger, the husband
of Katie, Kettemann said to him about a week before he (Kette-
mann) married Bertha that he wanted him to get out of the
house, and threatened if he did not get out, he would put him
out; and he testifies that Kettemann threatened to shoot him, and
raised a chair to strike him, calling him opprobrious names.
Conrad then asked his wife whether she intended to stay or go
with him.  She said that she would go with her husband.  There-
upon Katie, the plaintiff in the case, left the house of her father
with her husband.  A week after that he married Bertha Sacke,
now his widow.  Soon after Katie left she procured the admin-
istrator of her mother's estate to bring suit against her father
to make him account for the property of her mother's estate.
Her father was very much grieved by this suit, and, according
to some of the testimony, wept that his daughter should sue
him.  He married Bertha within a week after the daughter left
the house, and in the following spring—February, 1880—he
made a settlement with his daughter Katie, the plaintiff in this
case, of all matters in difference and dispute between them, and
a paper writing was drawn up and signed by Katie and her
husband, setting forth that settlement.  It covers about a page
of legal cap, and closes as follows:

"We do hereby forever release and discharge and acknowl-
edge the full payment and satisfaction of all claims of every
nature and description we or either of us have against said
John Kettemann.

                                    "E. P. RAYMOND,
            "Administrator of Barbara Kettemann.
                              "CONRAD METZGER,
                              "KATIE METZGER."

That is dated February 9, 1880. There was in the paper originally, at the end of it this: "Growing out of the administration or heir of Barbara Kettemann." These words were erased, so that it appears that some one, presumably John Kettemann, insisted upon making this paper a full and complete release and satisfaction of all claims of every kind, without any limitation whatever. And in consideration of this settlement, John Kettemann paid to Katie at that time in money or its equivalent, about $2,700, and gave her notes amounting to about $1,000, out of which, however, she did not realize much, if anything. There was real estate in which he had curtesy, and which he continued to occupy during his life, and which at his death went to Katie, which was valued at about $3,000; so that she got altogether about $6,000 out of her mother's estate. After this paper was signed, John Kettemann said he had settled with his daughter forever, and wept, and said: "Sued by my own daughter." From the time that Katie Metzger left her father's house in the fall of 1879, she never entered it again, or visited him, or spoke to him, not even when he was in his last sickness; and he never visited her, or spoke to her, or had any relations with her of any kind. They were the same, as the witnesses said, as though dead to each other. The date of this settlement is February 9, 1880, and on March 4, following, he made the will in question, by the terms of which he gave all of his property to his wife, whom he had married the week following the departure of his daughter from his house.

That will stood as he then wrote it for more than twenty years, by the terms of which he gave all his property to the woman who bore him two sons, who survive him, and are parties to this suit. It appears, then, that between John Kettemann and his daughter there was a bitter quarrel. He was undoubtedly a man of strong prejudices, of high temper or passion. He was a man of a rather miserly character. After his death $2,000 in money was found in the bank. He was parsimonious, stingy, somewhat, with his tenants and with those who dealt with him; and to be required by this suit to pay over to his daughter $2,700 in money or its equivalent undoubtedly made

a deep impression upon John Kettemann, and embittered him, to a great extent, toward his daughter. That she was embittered toward him is evidenced from the fact that she never visited him or spoke to him after she left his house during the twenty years that he lived. It is evident, as her conduct discloses, that in February, 1880, she regarded her father as a man of sound mind. She had this suit commenced against him shortly before that; she carried on negotiations with him through her attorney; she signed this paper of settlement releasing her claims against him. There was nothing in her treatment of him or conduct toward him then that indicated that she regarded him as of unsound mind.

According to all the testimony, Kettemann carried on his business until the day of his death. In the latter years of his life he did not do very much business. His store became somewhat dilapidated, and his stock of goods depreciated. But from the time he made this will until his death, covering a period of twenty years, he associated socially with men in general; he bought lands and built houses, and repaired houses; he rented them and collected the rents; he bought bonds and sold bonds; he ran his merchant tailoring establishment; and in all those transactions there is no evidence that he ever made a bad bargain; that he ever showed any mental incapacity to cope with the men with whom he dealt; that he ever failed to collect his rent or any other debt due him; the testimony shows that he collected promptly, and complained if he was not paid promptly. During this time, occasionally he became intoxicated, and an instance is testified to by witnesses showing his excitable character, when a dog that belonged to his former wife was lost, and he complained to the police, and threatened to kill himself if the dog was not found, and perhaps at that time flourished a pistol. He was excitable, undoubtedly, and sometimes became intoxicated, although he drank but very little away from his own home, but he had beer, and some witnesses testify, sometimes whisky in his own house. Taking all this testimony together, that offered by the plaintiff and by the defendants, and considering John Kettemann's life as testified to by his neighbors and acquaintances, down to the time of his death, we

were of the opinion that the testimony shows that he had at the time this will was made  sufficient mental capacity to make a will.   In fact, if the testimony of the interested witnesses should be disregarded, there is very little, if any, testimony in the record tending to show that he had not such capacity.   It does not require the highest degree of mental capacity to make a will, as is said in 25 Enc. Law (1st Ed.), 970:

"A person who, at the time of making his will has an understanding of the nature of the business in which he is engaged, a recollection of the property he means to dispose of, of the persons who have a claim upon his bounty and the manner in which it is to be distributed, has sufficient mental capacity to execute a will."

We find no testimony in this record that shows that John Kettemann did not understand, in 1880, the property that he had or its nature; that he did not know, and was not able to carry in his memory at that time, the persons who might be the proper objects of his bounty.   And the question always is, had he sufficient capacity, not to make *a* will in general, but to make *the* will.   And we find that the will which he in fact signed as I have said, was of the simplest character—simply giving to his wife all the property that he had.   And we are unable to find in this record—I think I would perhaps be justified in saying—any testimony, even taking the testimony of his daughter, the contestant, that establishes, if it stood alone, that John Kettemann did not have sufficient mental capacity to make this will in question.   Taking the testimony offered by the contestant alone and her witnesses, in connection with the story of John Kettemann's life, as disclosed by their evidence, we think the weight of it clearly is against the proposition that he had not sufficient capacity to make his will.

Upon the question of undue influence no direct testimony is offered.   There is no testimony that his wife ever spoke to him in regard to this will.   One witness testifies that her father said to him shortly after the marriage, that he ought to make a will so that Katie would not get anything; but undue influence must be of such a character that the act is not the act of the testator, but the act of some other person.   I cite author-

ities without reading: Schouler on Wills, Sections 228, 229; also *Monroe* v. *Barclay,* 17 Ohio St., 302, and all authorities there cited along that line.

The court charged the jury that they might infer undue influence from facts and circumstances. We do not think there was any error in the court's charge on this question of undue influence. Undue influence is usually shown by proving certain facts, and the question as to whether undue influence existed or not is to be determined from the facts as proven, the will itself, and all the facts and circumstances. It is seldom you have a witness testifying directly to acts of undue influence. In determining whether there was undue influence, the facts and circumstances surrounding John Kettemann when he made this will, his feeling toward his daughter, to which I have referred, his trouble with her, the lawsuit, the settlement, his feeling of affection toward his wife, were all to be taken into consideration.

The evidence shows that his daughter got from the estate of her mother about $6,000. John Kettemann left an estate when he died of about $15,000 to $16,000, a widow and two children besides Katie; so that out of the common fund, the property of John Kettemann, and that of his first wife, Kettemann probably thought that Katie had really had her share of the general property of her father and mother. And taking all the things into consideration, we think the will which John Kettemann made in March, 1880, was a natural will for him to make at that time. He had settled with his daughter; he had paid over this money to her; he knew she would have this piece of real estate; she had brought this suit against him, and it was evidently his purpose to settle with her then and there for all time to come. And after he had done that, he made this will disposing of his property. We find nothing in the evidence to show that this will was the result of undue influence. I have gone over the testimony in this case at some length, for the reason that it is claimed these are peculiarly questions for the jury, and that their finding should not be disturbed, unless clearly and manifestly against the weight of the evidence; and we are of that opinion. But in the judg-

ment of the court, the finding of the jury is clearly and mani-
festly against the weight of the evidence.    And when that
appears, it is the duty of the court in a will case, as in any
other case, to set aside the verdict and judgment and remand
the case for a new trial.    We find no other errors, but, in our
judgment, for the reason stated, the court of common pleas
erred in overruling the motion for a new trial, and the judg-
ment will therefore be reversed.

*Harry E. King, J. J. Waldvogel* and *Elmer E. Davis,* for
plaintiffs in error.

*Hamilton & Kirby,* for defendant in error.